AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Alabama

In the Matter of the Search of  )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )      Case No. 2: 17 mj 181- GMB
SEE ATTACHMENT A  )
  )
  )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ Middle _____ District of _____ Alabama _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Controlled Substances Act |
| 18 USC 1956, 1957 | Money laundering |
| 18 USC 1347 | Healthcare fraud |

The application is based on these facts:
See attached affidavit (ATTACHMENT 1) incorporated herein by reference and made part of this application.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Darryl Henton, Drug Enforcement Admin.
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8.4.17

_____
*Judge's signature*

City and state:  MONTGOMERY, AL

GRAY M. BORDEN, U.S. MAGISTRATE JUDGE
*Printed name and title*

## ATTACHMENT A

### Premises To Be Searched

The premises to be searched is all stored electronic data associated with the electronic medical records associated with any of the following accounts, usernames, office keys, or physicians:

- Familypractice4143@gmailcom;
- Familymedicalpractice.com;
- Medicalfamilypractice.com;
- Family Practice located at 4143 Atlanta Highway, Montgomery, Alabama, USA;
- Dr. Gilberto Sanchez; and
- AdvancedMD office key 129997

held and in the possession of AdvancedMD Software, Inc., 10876 South River Front Parkway, #400, South Jordan, Utah 84095 or any alternate location owned or controlled by that corporation or a related entity.

## **ATTACHMENT B**

### **Particular Things to be Seized**

1.      Information to be disclosed to the Government by AdvancedMD Software, Inc. (AdvancedMD).

To the extent that the information described in Attachment A is within the possession, custody, or control of AdvancedMD, including any electronic medical records, billing records, or correspondence with any person employed by or affiliated with the medical offices of Dr. Gilberto Sanchez, M.D., or Gilberto Sanchez M.D., Inc., or has been deleted but is still available to AdvancedMD, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), AdvancedMD is required to disclose the following information to the government from the account listed in Attachment A, provided that AdvancedMD is not required to disclose data generated before January 1, 2012:

a.      The contents of all electronic medical records created by, edited by, or associated with Dr. Gilberto Sanchez, practicing at 4143 Atlanta Highway, Montgomery, Alabama 36109, or any person employed by or affiliated with the practice of Gilberto Sanchez M.D., Inc.

b.      All records or other information regarding the individuals entitled to access the account created by or associated with Dr. Gilberto Sanchez, M.D., or Gilberto Sanchez M.D., Inc., including the individuals' full names, physical addresses, email addresses, telephone numbers, and other personal identifying information.

c.      Data showing the times in which the account described in Attachment A was accessed, the IP addresses from which the account was accessed, the records accessed, the individual user who accessed the account, and other types of information associated with the accessing of the account by remote account holders.

d.      The types of services utilized.

e.  All records of any kind stored by an account user.

f.  All records pertaining to communication between AdvancedMD and Dr. Gilberto Sanchez, M.D. or any employee or person associated with Gilberto Sanchez M.D., Inc., including, but not limited to, billing records.

2.  Information to be seized by the Government

All records and other evidence relating to violations of Title 21, United States Code, Section 841(a)(1), Title 21, United States Code, Sections 1956, 1957, and 1347, since January 1, 2012, including, but not limited to, information pertaining to:

1.  Original patient and medical records documenting or evidencing the unlawful prescribing of scheduled controlled substances.

2.  Records documenting the use of the proceeds of unlawful prescribing of controlled substances for means of promoting the ongoing criminal enterprise through, inter alia, securing an electronic medical records service.

3.  Records relating to who created, used, maintained, or operated an electronic medical records account on behalf of Dr. Gilberto Sanchez, M.D., or Gilberto Sanchez M.D., Inc.

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## SEARCH AND SEIZURE WARRANT

### I. INTRODUCTION

**A.    Agent Training and Experience**

Your affiant, Darryl W. Henton, is an investigator or law enforcement officer of the
United States within the meaning of Title 18, United States Code, Section 2510, that is, an
officer of the United States who is empowered by law to conduct investigations and to make
arrests for offenses enumerated in Title 18, United States Code, Section 2516. Your affiant has
been a special agent of the Drug Enforcement Administration (DEA) since November of 1997.
Prior to becoming a special agent, your affiant was a state of Alabama, City of Mobile, Alabama
police officer from November of 1985 to November of 1997. Your affiant also attained a
bachelor of science degree in criminal justice and a master's degree in public administration
from Troy State University in Troy, Alabama.

Pursuant to my employment with the DEA, I have investigated criminal violations of
federal drug laws and related offenses, including, but not limited to, violations of Title 21,
United States Code Sections, 841, 843, 846, 848, 856, 952, 960, and 963, and Title 18, United
States Code, Sections 1952 and 1956. Your affiant is familiar with, and has employed, all
normal methods of investigation, including, but not limited to, visual surveillance, electronic
surveillance, informant interviews, interrogation, and undercover operations.

In connection with drug trafficking investigations, your affiant has participated in and/or
executed numerous search warrants, including residences of drug traffickers/manufacturers and
their co-conspirators/associates, stash houses used as storage and distribution points for

controlled substances, and business offices used by drug dealers as "fronts" to conceal their unlawful drug trafficking activities and the proceeds obtained from unlawful drug trafficking.

Your affiant has participated in investigations involving the following types of drugs: oxycodone, hydrocodone, hydromorphone, cocaine, cocaine base, marijuana, and other controlled substances. Your affiant has also interviewed numerous witnesses to, and participants in, drug trafficking organizations that illegally distribute prescription drugs who have described to me the techniques that they and other organization members used to distribute and dispense controlled substances as well as to transport, conceal, or launder the illegal drug proceeds.

As part of my training and experience, your affiant is aware that certain controlled substances are often abused and illegally diverted from what would otherwise be considered legitimate medical uses. In particular, opiate-based narcotics that are intended to legitimately treat chronic to moderately severe pain are often diverted and abused for the euphoric effect they produce, an effect similar to that associated with heroin use. Your affiant also knows that individuals who abuse these types of drugs are at risk for becoming physically dependent on the drugs.

Your affiant has investigated and assisted with the investigation of individuals and organizations that illegally disburse or dispense controlled substances under the guise of operating seemingly legitimate medical clinics (colloquially known as "pill mills"). These pill mills generally operate as pain management clinics, emergency care or "urgent care" clinics, or other similarly characterized clinics. Typically, an individual who seeks to abuse or illegally divert controlled substances will attend one of these medical clinics. The physician at the medical clinic issues a prescription for a controlled substance, often without performing the minimal professionally required medical assessment of the patient's complaints, or properly

2

evaluating whether disbursing the controlled substances is medically appropriate. As a result, these clinics attract large numbers of individuals who often travel long distances seeking prescriptions from these physicians. Additionally, it is not unusual in these investigations for the owners, staff, and physicians at the medical clinics to dispense the controlled substances themselves, or to refer patients to particular pharmacies that are known to fill the illegitimate prescriptions for controlled substances.

**B.    Premises**

I make this affidavit in support of an application for the issuance of a warrant to search and seize information associated with electronic medical records (EMR) accounts that are stored at premises owned, maintained, controlled, or operated by AdvancedMD Software, Inc. (AdvancedMD) headquartered in South Jordan, Utah. This affidavit is in support of an application for a search warrant for medical records associated with the health care provider Dr. Gilberto Sanchez, M.D., who practices at a medical office located at 4143 Atlanta Highway, Montgomery, Alabama 36109.

The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Section 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require AdvancedMD to disclose to the government records and other information in its possession pertaining to the subscribers or customers associated with any EMR accounts owned by or associated with Sanchez, including the contents of such records.

**C.    Statutory Authority**

This Court has jurisdiction to issue the requested warrant because it is a court with "jurisdiction over the offense under investigation." 18 U.S.C. § 2711(3)(A)(i). As such, it is a

3

"court of competent jurisdiction" authorized to issue the requested warrant.  18 U.S.C. § 2703(a).
The presence of a law enforcement officer is not required for the service or execution of this
warrant.  18 U.S.C. § 2703(g).

**D.    Background and Definitions**

Based on my training and experience, and the training and experience of other DEA
diversion investigators, special agents, and other law enforcement officers, I know that:

1.  Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person
    knowingly or intentionally to distribute or dispense a controlled substance except as
    authorized by that subchapter.

2.  Under Title 21, United States Code, Sections 822(a)(1) and (a)(2), and 21 C.F.R.
    § 1301.11 and other regulations, a person who distributes or dispenses any controlled
    substance, or who proposes to dispense any controlled substance, must obtain a
    registration from the DEA every three years.

3.  Under 21 C.F.R. § 1306.03, a prescription for a controlled substance may only be issued
    by a practitioner who is both authorized to prescribe in the jurisdiction in which she is
    licensed to practice her profession and registered with the DEA (unless otherwise exempt
    from registration).

4.  Under 21 C.F.R 1306.3(a)(1) and (2) and 21 C.F.R. § 1306.4(a), a prescription for a
    controlled substance is only valid if it has been issued for a legitimate medical purpose by
    an individual practitioner acting in the usual course of professional practice.

5.  By law, under 21 C.F.R. § 1306.04(a), the responsibility for the proper prescribing and
    dispensing of controlled substances is upon the prescribing practitioner, but a
    corresponding liability rests upon the pharmacist who fills a prescription.

4

6. Pursuant to 21 U.S.C. § 881(a)(6), all moneys and things of value that were furnished or intended to be furnished in exchange for a controlled substance, that constitute proceeds traceable to such an exchange, or that were used or intended to be used to facilitate the sale or exchange of a controlled substance in violation of 21 U.S.C. § 841 are subject to seizure and forfeiture to the United States.

7. Pursuant to 21 U.S.C. § 881(a)(4), all vehicles that are used, or are intended for use, to transport, or in any manner facilitate the transportation, sale, receipt, possession or concealment of a controlled substance in violation of 21 U.S.C. § 841 are subject to seizure and forfeiture to the United States.

8. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. § 1957 is subject to forfeiture to the United States.

9. Pursuant to 18 U.S.C. § 1957, it is a crime to engage or attempt to engage in a monetary transaction involving criminally derived property having a value greater than $10,000, knowing that the property was derived from unlawful activity.

10. Pursuant to 18 U.S.C. § 1956, it is a crime to engage or attempt to engage in a monetary transaction involving criminally derived property: (1) with the intent to promote the carrying on of a specified unlawful activity; (2) with the intent to engage in a specified violation of the Internal Revenue Code; (3) with the intent of concealing the source, location, ownership, nature, or control of the proceeds of the specified unlawful activity; or (4) to avoid a state or federal reporting requirement.

11. Pursuant to 18 U.S.C. § 1347, it is a crime to defraud a health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, the money

5

or property owned by, or under the custody or control of, any health care benefit program.

12. By law, under 21 C.F.R. § 1304.04, inventories and records of controlled substances listed in Schedule II shall be maintained separately from all other records maintained by the registrant. Likewise, inventories and records of controlled substances in Schedules III, IV, and V must be maintained separately or in such a form that they are readily retrievable from the ordinary business records of the practitioner. All records related to controlled substances must be maintained and be available for inspection for a minimum of two years.

13. The Alabama Board of Medical Examiners requests that a physician maintain a patient's complete treatment records (including evaluations, diagnoses, and prognoses) for a period of no less than ten years from the patient's last visit.

14. Other than medical records, it is standard practice for documents to be kept by medical offices in the normal course of business reflecting daily billing, accounts received, bank records, deposit receipts, telephone records, appointment books and sign in sheets. These financial records and billing documents often contain evidence to establish that patients have consulted with the doctor or have received prescriptions from the doctor. Further, prescription pads are normally kept in offices, exam rooms and laboratories of medical practices that prescribe controlled substances.

15. Computers are used in medical offices to record patient information, medical records, prescription logs, appointments, billing and payment records, work schedules and other information needed to operate a medical practice.

6

16. By law, under 21 C.F.R. § 1304.33, DEA registrants must submit information about all transactions in which a Schedule II or Schedule III-N (narcotic) controlled substance is acquired or distributed (i.e., from a supplier to a pharmacy). The information is transmitted to DEA's Automation of Reports and Consolidated Ordering System (ARCOS) Unit on a quarterly basis and maintained in a DEA database.

17. Based upon my training and experience, I know that Schedule II, III, and IV substances are sold in varying strengths and under various brand names.

18. Based upon my training and experience, I know that the following types of Schedule II, III, and IV controlled substances are often subject to abuse:

    a. OxyContin and Roxicodone are brand names of oxycodone, an opioid narcotic analgesic that is a Schedule II controlled substance;

    b. Methadone is an opiate narcotic analgesic that is a Schedule II controlled substance; I know that methadone is highly addictive and can be lethal when taken in large dosages and in combination with other drugs; I also know that methadone is frequently sought by those who are addicted to opioids;

    c. Percocet is the brand name of oxycodone combined with acetaminophen (APAP), an opioid narcotic analgesic that is a Schedule II controlled substance;

    d. Dilaudid is the brand name of hydromorphone, an opioid narcotic analgesic that is a Schedule II controlled substance;

    e. Opana is the brand name of oxymorphone, an opioid narcotic analgesic that is a Schedule II controlled substance;

    f. Lorcet/Lortab is the brand name of hydrocodone with acetaminophen, an opioid narcotic analgesic and Schedule II-N controlled substance;

7

g.   Xanax is the brand name of alprazolam, a benzodiazepine used to treat anxiety and panic disorders and a Schedule IV controlled substance;

h.   Soma is the brand name of carisoprodol, a muscle relaxer and a Schedule IV controlled substance;

19. Under 21 C.F.R. § 1306.05, prescriptions for Schedule II, III, and IV controlled substances are required to be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form (e.g., "2mg" or "80mg"), quantity prescribed (e.g., "#120" or 120 tablets), directions for use, and the name, address and registration number of the practitioner.

20. Based on my training and experience, indications that physicians are issuing prescriptions for controlled substances outside the course of professional practice and without a legitimate medical purpose include, but are not limited to, the following:

a.   The medical clinic accepts only cash and does not accept insurance;

b.   Patients travel long distances (from out-of-county or out-of-state);

c.   Patients line up for appointments hours in advance;

d.   Appointments are not for a specific time;

e.   Patients travel in groups;

f.   High volume of patients going through the clinic;

g.   Cursory physical examination, or no physical examination, during initial and follow-up visits;

h.   Brief initial and follow-up visits;

i.   Doctor does not undertake an independent evaluation of patient (i.e., patient suggests or directs the medication to be prescribed);

8

j.  Doctor writes out prescriptions for controlled substances and places them in the patient's file prior to the patient's visit;

k.  Failing to treat patients with anything other than controlled substances;

l.  Failing to heed warnings by others that drug-seeking persons are trying to obtain controlled substances from the doctor;

m.  Patients who appear and behave in a manner consistent with abusing, or being addicted to, controlled substances;

n.  Patients engage in drug deals on clinic property or openly discuss diverting their prescriptions;

o.  Directing patients to particular pharmacies to fill their prescriptions;

p.  Pharmacies have stopped filling the physician's prescriptions due to suspicious activity or high number of controlled substance prescriptions; and

q.  Clinic owners/operators and employees are particularly aware of law enforcement or potential investigations.

21. Based on my training and experience, reasons that a pharmacist would not dispense a controlled substance prescribed by a specific doctor include, but are not limited to, the following:

a.  A pharmacy receives an unusually high volume of prescriptions for controlled substances from the same physician;

b.  Pharmacist is aware that patients travel long distances to see a particular physician (who is not a highly sought-after specialist); and,

c.  Other pharmacies have stopped filling a particular physician's prescriptions due to suspicious activity or high number of controlled substance prescriptions.

9

22. Based on my training and experience, your affiant also knows that EMRs are often maintained on cloud-based platforms. I also know that EMRs can often provide evidence of a doctor's failing to perform the necessary procedures before prescribing controlled substances, and can otherwise serve as evidence of a doctor's operating a pill mill.

## II. INVESTIGATION OF SANCHEZ

### A.    Sanchez's Previous Disciplinary History

Based upon my investigation, I am aware that Sanchez is a general practice physician practicing at 4143 Atlanta Highway in Montgomery, Alabama. I know that Sanchez has been practicing at this location, intermittently, since at least 2006. I also know that Sanchez is the incorporator and registered agent of Gilberto Sanchez M.D., Inc., a business entity registered as a medical practice with the state of Alabama and having a reporting address of 4143 Atlanta Highway in Montgomery, Alabama.

Based upon my investigation, I am aware that Sanchez is a general practice physician practicing at 4143 Atlanta Highway in Montgomery, Alabama. I know that Sanchez has been practicing at this location, intermittently, since at least 2006. I also know that Sanchez is the incorporator and registered agent of Gilberto Sanchez M.D., Inc., a business entity registered as a medical practice with the state of Alabama and having a reporting address of 4143 Atlanta Highway in Montgomery, Alabama.

I am aware that Sanchez has previously been the subject of disciplinary proceedings brought against him by the Alabama Board of Medical Examiners (ABME) and based upon Sanchez's prescribing of controlled substances. The details of those proceedings are, based upon information provided to me by the ABME, set forth below.

Sometime around the middle of the previous decade, Sanchez began to specialize in weight loss treatment. As part of this specialization, he opened six diet clinics, with one clinic located in each of the following Alabama towns: Montgomery, Troy, Ozark, Prattville, Auburn, Andalusia, and Dothan. Sanchez did not obtain additional licenses from the DEA to prescribe controlled substances at any of these non-Montgomery locations.

Soon after opening these clinics, the ABME received reports that, at these weight loss clinics, Sanchez and those working for him were inappropriately prescribing and dispensing controlled substances. Accordingly, the ABME began an investigation. As part of that investigation, in May and June of 2006, the ABME sent undercover investigators posing as new patients into Sanchez's clinics. At the clinics, Sanchez's employees (none of whom were doctors) administered or dispensed to the investigators a number of amphetamine-based controlled substances. The employees did so without conducting any type of physical examination. They also failed to label the controlled substances. One employee even injected drugs into patients without being supervised by any trained health care professional. Most glaring, physicians were not present on all occasions when the employees dispensed these drugs.

To facilitate the employees' dispensing the drugs, Sanchez left at each clinic signed, but otherwise blank, prescription forms. As they dispensed medication, the employees completed the forms by adding the following information: (1) the patient's name; (2) the type of drug dispensed; and (3) the quantity dispensed.

Also troubling was the way that Sanchez arranged for the drugs to make their way to the clinics. Sanchez hired employees who did not have DEA registrations to transport the drugs from a wholesale pharmacy in Montgomery to the various clinics.

11

In June of 2006, Sanchez contacted the ABME and requested information about proper prescribing practices for amphetamines. The ABME promptly provided that information. Nonetheless, Sanchez did not alter the way the weight loss clinics operated.

In July of 2006, the ABME confronted Sanchez about its investigation. Sanchez admitted to the ABME that he had failed to comply with state and federal laws associated with the prescribing and dispensing of controlled substances. However, Sanchez attributed his violations to his failure to fully comprehend the governing rules.

In the course of its investigation of the weight loss clinics, the ABME also discovered that Sanchez was unlawfully prescribing another controlled substance—Marinol. Marinol is the brand-name version of the drug dronabinol. It contains tetrahydrocannabinol (THC) and is often prescribed to treat nausea or vomiting caused by cancer medications and to stimulate the appetites of individual suffering from Autoimmune Deficiency Syndrome (AIDS). It is a Schedule III controlled substance.

The ABME investigation revealed that Sanchez was supposedly prescribing Marinol to treat chronic pain. Sanchez's doing so constituted an off-label use of the drug. Sanchez tried to support his prescribing of Marinol by providing research articles that purportedly endorsed the use of Marinol to combat pain. However, the board rejected those articles as not being based upon scientific studies.

The ABME investigators suspected that, contrary to Sanchez's claims of prescribing Marinol to treat pain, he was actually prescribing it to facilitate recreational drug use. The ingestion of Marinol will cause an individual to test positive for THC. Importantly, the use of marijuana will cause the same result. Thus, as the ABME found, a prescription for Marinol is essentially a "get out of jail free card" for the use of marijuana. The ABME discovered at least

12

one instance of one of Sanchez's patients obtaining a prescription for Marinol on the same day that the patient took a workplace drug test. The ABME also interviewed a patient who claimed that he received a prescription from Sanchez for Marinol after telling Sanchez that he was a frequent marijuana user.

In light of Sanchez's state regulatory violations associated with the weight loss clinics and the Marinol prescriptions, in 2009, the ABME sanctioned him. It did so by placing him on indefinite probation and fining him $70,000.00. One of the terms of Sanchez's probation was that Sanchez had to limit his practice to only one location. He also was precluded from dispensing medication and from working at a practice wherein some other physician dispensed medication.

In February of 2010, the ABME determined that Sanchez had violated one of the terms of his probation. Namely, Sanchez had practiced at an addiction treatment clinic in Montgomery and at his Montgomery practice. Because he was practicing at more than one place, in violation of his probation, the ABME imposed a six-month suspension of Sanchez's medical license.

Sanchez served that six-month suspension and then continued with his probation. On April 27, 2012, the ABME lifted the probation and terminated the restrictions upon Sanchez's license.

**B.    Recent Reports to the ABME of Dr. Sanchez Operating a Pill Mill**

In 2016, regulatory and law enforcement agencies received a series of reports suggesting that Sanchez was operating a pill mill through his medical practice, located at 4143 Atlanta Highway in Montgomery.

The first report came on March 28, 2016. On that date, F.B. contacted the ABME regarding Sanchez. F.B. said that her daughter, S.B. was a current patient of Sanchez's. S.B.

13

received controlled substance prescriptions from Sanchez. According to F.B., S.B. weighed only 93 pounds and was in very poor health. Thus, in February of 2016, F.B. contacted Sanchez's office and asked that Sanchez not prescribe such medications to S.B. Sanchez ignored this request and continued to prescribe controlled substances to S.B., according to F.B. The ABME later informed the DEA of F.B.'s report.

Based upon F.B.'s information, the ABME opened an investigation. Soon thereafter, an anonymous letter came to the ABME. That letter pertained to Sanchez. According to the letter, dated April 4, 2016, Sanchez was: (1) prescribing controlled substances unnecessarily and for no legitimate medical purpose; (2) fraudulently billing public and private insurance providers for office visits by claiming that an office visit lasted at least 20 minutes when in fact the visit lasted only 4 minutes; (3) providing controlled substance prescriptions without seeing patients; and (4) operating a car dealership through which he was fraudulently selling cars to employees. The ABME subsequently sent a copy of the letter to the DEA.

As part of its investigation, on May 11, 2016, the ABME served an administrative subpoena upon Sanchez's office. The subpoena requested that Sanchez produce medical records associated with approximately 17 named patients. Among the named patients was S.B. The ABME used its own criteria to select the other 16 patients whose charts it asked Sanchez to produce. Sanchez produced the requested records to the ABME on June 24, 2016.

## C.     Report to Crime Stoppers Organization

Subsequently, the Central Alabama Crime Stoppers received an anonymous tip regarding Sanchez. That report stated that Sanchez and a licensed professional counselor employed by him, Johnnie Sanders, were jointly operating a pill mill. The tipster alleged that Sanchez was prescribing controlled substances unnecessarily and that Sanders was brokering pill swaps

14

among Sanchez's patients. For example, the tipster said, "A friend was recently approached by Ms. Sanders to sell some Xanex to one of her clients who had run out of her prescription too soon." The Crime Stoppers organization sent this report to the DEA. Upon receipt of the report, the DEA began an investigation of Sanchez and those working for him.

## D.    Pharmacists' Concerns

Even before receiving information about Sanchez, in June of 2016, a DEA diversion investigator working with me contacted various pharmacists located in and around Montgomery. The diversion investigator contacted the pharmacists as part of an unrelated investigation and asked the pharmacists whether the pharmacists had concerns about the controlled substances prescribing practices of any area physicians. Three pharmacists immediately stated that they were concerned about prescriptions written by Sanchez. The details of such statements are as follows:

- Pharmacist Carl Bledsoe of Adams Drugs located in Wetumpka, Alabama stated that he knew that patients lined up outside of Sanchez's office to get an appointment with him.

- Pharmacist Tim Guerin of Fountain City Pharmacy located in Prattville, Alabama told the diversion investigator that he was suspicious of Sanchez's prescriptions because Sanchez wrote a high number of such prescriptions.

- Pharmacist Cedric Kousk of CVS Pharmacy located on Cobbs Ford Road in Prattville said that Sanchez wrote a higher number of controlled substances prescriptions and at higher quantities than most area physicians.

## E.    Interview of Patient

15

On March 9, 2017, I received a telephone call from B.H. B.H. identified herself as a current patient of Sanchez's. She said that, on March 1, 2017, she went to a scheduled appointment with Sanchez. During that office visit, B.H. also saw Sanders. B.H. told me that Sanchez informed her that all patients seeing Sanchez were required to also see Sanders. Sanchez told B.H. that this requirement was in accordance with Alabama law.[1] During her appointment with Sanchez, B.H. received a prescription for 100 10-miligram tablets of Norco, a band-name version of acetaminophen and hydrocodone. The prescription was to treat B.H.'s pain.

B.H. reported that she returned to Sanchez's office on March 7. B.H. carried with her to Sanchez's office the remaining pills (approximately 85 of the prescribed 100) she had obtained pursuant to the March 1 prescription. During that visit, she informed Sanchez that the Norco was not effectively reducing her pain. According to B.H., Sanchez then took the pill bottle from B.H. and wrote B.H. a new 10-day prescription of Percocet. Later that day, B.H. went to a pharmacy to fill her new prescription. The pharmacist refused to do so because B.H. had so recently filled the March 1 controlled substances prescription. When B.H. protested that she had returned to Sanchez the Norco pills obtained by way of the March 1 prescription, the pharmacist advised B.H. that she should file a police report.

According to B.H., the following day, March 8, B.H. was able to fill the Percocet prescription at a different pharmacy. Nonetheless, concerned about the March 7 incident at the pharmacy, on March 9, B.H. returned to Sanchez's office. She requested that Sanchez return the Norco prescription bottle to her. Sanchez refused to do so. Instead, he showed B.H. the bottle stored in one of his filing cabinets. It appeared to B.H. that the bottle contained fewer than the

---

[1] B.H. erroneously stated that the counselor she saw was named "Johnnie Launders."

85 pills it had contained when B.H. provided the bottle to Sanchez.  Sanchez also told B.H. that the "DEA was coming to pick it up."  B.H. then left the office.

B.H. also informed me that she had heard that Sanchez's other patients "sell their meds."

After speaking with B.H., I examined DEA records and confirmed that no one contacted the DEA in March of 2017 and requested that a DEA employee retrieve medication from Sanchez's office.

**F.    ABME'S Recovery of Controlled Substances from Sanchez's Office**

Soon thereafter, Farley Pugh, the office manager at Sanchez's medical practice, contacted Randy Dixon of the ABME.  Pugh stated that Sanchez had, at his office, bottles of medication that he had taken from patients because the patients had not "tolerated" the prescribed medications.

On March 27, 2017, Dixon met with Sanchez at Sanchez's office.  Sanchez gave Dixon 13 bottles of controlled substances.  Sanchez informed Dixon that he (Sanchez) had been storing these bottles inside a locked file cabinet.  Sanchez also claimed to have made notes in the charts of each patient from whom he had confiscated a controlled substance.  Sanchez also told Dixon that he (Sanchez) had counted the pills in a bottle before taking that bottle from a patient.

Upon obtaining the 13 bottles, Dixon provided them to his colleague, ABME investigator Edwin Rogers.  Rogers noticed that B.H.'s pill bottle was one of the 13.  Rogers opened the bottle bearing B.H.'s name and found only four Norco pills in the bottle.  As noted, B.H. told me that the bottle contained 85 pills when she gave it to Sanchez.  Rogers also noticed that one of the other pill bottles contained pills of a type other than the type listed on the bottle's label. Moreover, another bottle contained nine morphine sulfate pills; however, Sanchez's notes indicated that the bottle contained 11 pills at the time Sanchez obtained it.

17

## G.    PDMP Data

Pursuant to our investigation, DEA special agents contacted the ABME to retrieve data associated with Sanchez and stored in that agency's Prescription Drug Monitoring Program (PDMP) data. That database exists to store information about all controlled substances prescriptions filled or dispensed within Alabama. Pharmacists who fill prescriptions and physicians who dispense medications are required to make entries into the PDMP database whenever they dispense a controlled substance. The information that must be reported includes: (1) the patient's name; (2) the prescribing physician; (3) the type and quantities of controlled substances prescribed; and (4) the name of the dispensing pharmacy or physician.

The PDMP database showed that, in 2015, Sanchez was the 32d highest ranking prescriber in Alabama for prescribing scheduled controlled substances. The list included 11,791 doctors. In 2016, he moved up to 29 on that list, which by then had grown to 11,899 prescriber. So far in 2017, Sanchez is at number 54 out of 13,150. This list includes physicians and doctors of osteopathy who practice palliative care, those who specialize in pain management, and those who practice in larger markets than Montgomery.

## H.    Signed Prescriptions Mailed to the ABME

Also in 2017, an anonymous person mailed to the office of the ABME an envelope containing a set of blank prescriptions that appeared to have been already signed by Sanchez. The ABME took this mailing to indicate that Sanchez was pre-signing prescriptions before actually seeing patients. The ABME notified me of these signed prescriptions.

## I.    Opelika Police Interview of Sanchez's Former Patient

During our review of the PDMP data, we discovered that one of Sanchez's controlled substances patients had an outstanding state warrant issued by the Circuit Court of Lee County,

18

Alabama. Accordingly, in July of 2017, the Opelika Police Department arrested that former patient, M.H.

On July 14, 2017, an Opelika Police detective met with M.H. at the Lee County Sheriff's Department. The detective asked M.H. if he (M.H.) knew anything about "murders, people selling drugs, people selling stolen property, corrupt police officers, corrupt politicians, corrupt doctors, or corrupt nurses." M.H. replied that he knew many drug dealers, and asked the detective to specify about whom the detective wished to receive information.

The detective then asked M.H. if he (M.H.) had ever received treatment from a Montgomery doctor. M.H. replied that, in 2015, he had gone to see Sanchez. M.H. claimed that he had done so because, in 2014, he had been incarcerated in Montgomery with one of Sanchez's patients, F.S. F.S. had told M.H. that M.H. could get pills from Sanchez if M.H. had cash and a legitimate reason. Upon release from custody, M.H. had contacted F.S. (who had also been released) and received instruction from F.S. on how to get pills from Sanchez.

## J.   Surveillance of Sanchez's Office

Additionally, during the spring and summer of 2017, IRS-CI Special Agent Chris Forte conducted routine surveillance of Sanchez's office. Special Agent Forte observed: (1) during the early morning hours, individuals lined up outside of the office apparently waiting for the office to open; and (2) many cars in the office's parking lot throughout the day.

## K.   Expert Review of Medical Files

As noted, Sanchez provided to the ABME files associated with specific patients. The ABME then transferred a copy of those files to the DEA. The ABME also pulled the PDMP reports associated with those patients and gave those reports to the DEA as well. Thereafter, I sent the files to Dr. Gary Kaufman, a licensed specialist in interventional pain management and

neurology practicing in Brunswick, Georgia. Dr. Kaufman reviewed eight files to determine whether, as to those seven files, Sanchez had prescribed the controlled substances for legitimate purposes and within the scope of Sanchez's normal practice.

Dr. Kaufman found flagrantly inappropriate prescribing reflected in six of the eight files. As for the other two files, Dr. Kaufman had concerns, but acknowledged that those two patients presented difficult medical issues. In the obviously bad files, Dr. Kaufman found the following consistent problems: (1) Sanchez was performing minimal physical examinations; (2) Sanchez's diagnoses were vague and often consisted of just laundry lists of typical problems that are known to trigger pain; (3) Sanchez routinely increased dosages or changed medications without providing an explanation for doing so; (4) Sanchez continued to prescribe controlled substances despite patients, after submitting urine samples for drug screening, testing positive for illegal drugs or controlled substances that Sanchez had not prescribed, or negative for the drugs Sanchez had prescribed; (5) Sanchez issuing prescriptions for controlled substances and then not document having done so in the patient's medical records; and (6) Sanchez providing early refills to patients based upon obviously phony excuses provided by patients.

Specific anecdotes reveal the impropriety of Sanchez's practice. One patient, A.S., went to the hospital on August 18, 2015. The hospital admitted her for having "an altered mental status." In essence, it appeared that she had overdosed on controlled substances. Sanchez was aware of this and documented it in A.S.'s chart. Nevertheless, at her next appointment, Sanchez prescribed A.S. Xanax, Norco, and Percocet. A.S. later died. Contemporaneous police reports attributed her death to "natural causes." To the best of my knowledge, no one ever performed an autopsy. Nevertheless, when informed of A.S.'s death (after he completed the chart review), Dr. Kaufman stated that he was not surprised that A.S. had died, and he stated that it was most

20

probable, based upon what he saw in the chart, that she had overdosed on controlled substances provided by Sanchez.

Another patient received a prescription from Sanchez for codeine cough syrup. Nevertheless, Sanchez did not document this prescription in the patient's medical records. Nor did Sanchez even note in the records that the patient had a sore throat.

The charts also reflected sheer carelessness. In one file, Sanchez noted that male patient Wille Duncan had "no vaginal discharge." Sanchez also purported to have examined Duncan's female anatomical parts. On a female patient, Sanchez claimed to have performed a detailed pelvic examination at each of the patient's monthly office visits for over a year. Dr. Kaufman assured the DEA that no female patient would voluntarily submit to such an invasive procedure on a monthly basis without a compelling medical justification.

Dr. Kaufman reviewed the chart associated with S.B.—the patient about whom F.B. contacted the ABME. Dr. Kaufman concluded that the chart did reflect unnecessary prescribing of controlled substances. However, Dr. Kaufman did not consider S.B.'s chart to constitute as flagrantly bad care as the care reflected in other charts.

**L.     Interview of Sanchez's Former Employee**

On July 18, 2017, I interviewed a former employee of Sanchez's medical practice, Lillian Akwuba. Akwuba stopped working for Sanchez in 2016. Akwuba informed me, inter alia, that, when Akwuba worked for Sanchez, Sanchez frequently used an iPad tablet computer to review medical charts. Akwuba also informed me that she (the employee) did likewise, and that it was not uncommon for employees of Sanchez's practice to carry iPad computers home and to complete work from home.

**M.     CMS Information**

21

On July 19, 2017, a special agent of the United States Department of Health and Human Services – Office of Inspector General reviewed data associated with Medicare and Medicaid reimbursement for services performed by Sanchez and medications prescribed by Sanchez. The special agent determined that, over the past five years, Medicaid has paid approximately $1.5 million each year for controlled substances prescribed by Sanchez. Based upon the foregoing, it is probable that some of those payments were for illegitimate prescriptions.

## N.   Identification of AdvancedMD as Sanchez's EMR Provider

On August 1, 2017, I and other agents executed a search warrant at Sanchez's office, located at 4143 Atlanta Highway in Montgomery. During that search, I found documents indicating that Sanchez stores electronic patient records on cloud-based computer systems and other storage media under the ownership or control of AdvancedMD—a third-party electronic medical records storage provider. Moreover, I interviewed with employee's of Sanchez's practice. Those employees informed me that Sanchez contracts with AdvancedMD for electronic medical records storage. Additionally, during agents' review of electronic records, the agents identified the following email addresses and other identifiers as possible account descriptors Sanchez's accounts with AdvancedMD:

- Familypractice4143@gmailcom;
- Familymedicalpractice.com;
- Medicalfamilypractice.com;
- Family Practice located at 4143 Atlanta Highway, Montgomery, Alabama, USA;
- Dr. Gilberto Sanchez; and
- AdvancedMD office key 129997.

### III. PROCEDURES FOR SEARCHING

22

I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require AdvancedMD to disclose to the government copies of the records and other information (including the content of communications) particularly described in Attachment A and Attachment B.  Upon receipt of the information described in Attachment B, government-authorized persons will review that information to locate the items described in Attachment B.

### IV.  REQUEST FOR SEALING

It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant affidavit.  I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation and not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.  In addition, this affidavit includes personal identifying information and/or protected medical information for certain patients of Sanchez, and thus restricted access is desirable to protect confidentiality.

### V.  CONCLUSION

Based upon the foregoing and upon my training and experience, I submit that there is probable cause to believe that the premises described as the EMR accounts that are stored at premises owned, maintained, controlled, or operated by AdvancedMD headquartered in

23

South Jordan, Utah containing medical records associated with the health care provider Dr.

Gilberto Sanchez, M.D., who practices at a medical office located at 4143 Atlanta Highway,

Montgomery, Alabama 36109, contains fruits, instrumentalities, and evidence related to possible

violations of Title 21, United States Code, Section 841(a)(1), to wit, prescribing controlled

substances outside the course of professional practice and without a legitimate medical purpose.

    I swear under penalty of perjury that the foregoing is true and correct.

Darryl W. Henton
Special Agent, Drug Enforcement Administration


Sworn to before me this
___ day of August, 2017.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF ALABAMA

24